**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TONI TATE, for herself and behalf of her minor child, CALI MCCULLER; CHRISTOPHER HARBIN; and CIERRA HARBIN,    ) ) ) ) ) | |
| Plaintiffs,    ) | Case No. |
| v.    ) ) | Judge |
| THE CITY OF CHICAGO; Chicago police officers SUZANNE L. NIEMOTH (Star #17958); JEREMY D. ARRINGTON (#16330); OSCAR D. BENAVIDES (#4839); COLIN BLADES (#14679) ANTHONY P. BRUNO (#1123); YVETTE CARRANZA (#13435); DANIELLE M. CUSIMANO (#16619); ADRIEN T. FRANKLIN (#9198); VICTOR J. GUEBARA (#17147); HORST E. HEGEWALD (#18609); ANTONIO D. MIRANDA (#8264); BRENDAN T. MULLIGAN (#10132); SEAN RYAN (#13198); JEFFERY A. SHAFER (#17177); MATTHEW J. SIEBER (#10163); CURTIS L. WEATHERSBY (# 7866); and OTHER, CURRENTLY UNKNOWN CHICAGO POLICE OFFICERS,    ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Magistrate Judge |
|     ) | Jury Demanded |
| Defendants.    ) ) | |

## COMPLAINT

### Summary

1.     Plaintiffs, by and through their attorney, The Law Offices of Al Hofeld, Jr., LLC, bring this action against defendant City of Chicago pursuant to 42 U. S. C. § 1983 for needlessly traumatizing a law-abiding family and violating their Constitutional rights, and state as follows:

2.     At approximately 9:45PM on Monday, August 5, 2019, Toni Tate and her adult children, Christopher Harbin (age 18) and Cierra Harbin (age 22), were getting ready for

bed. Ms. Tate's infant daughter, Cali, then 11-weeks-old, was sleeping peacefully in her crib in her mother's room in the family's second floor apartment.

3.      Without knocking or announcing their office, between 10 and 15 plainclothes Chicago police officers suddenly broke down the front door of the apartment – that is to say, broke it off of its hinges - screamed "SEARCH WARRANT!" and "GET DOWN ON THE F---ING GROUND!", and pointed rifles and other guns point blank at the family, *including at Cierra as she cradled three-month-old Cali in her arms*. Officers' guns were loaded, and their fingers were on the triggers. Ms. Tate was afraid her son Christopher was going to be shot. Ms. Harbin was afraid Cali was going to be shot. Officers then handcuffed the adults for two hours and tossed and needlessly destroyed the family's personal property in several rooms. Officers did not activate their body cameras until approximately five minutes after they entered, too late to capture their use of force, in violation of the department directive on body worn cameras.

4.      It was all a mistake - another a bad search warrant by Chicago police that hurt another innocent, law-abiding family of color who were not police suspects. Police did not find inside Ms. Tate's apartment any of the contraband or other items referenced in the warrant. They did not find the target of the search warrant there. They did not arrest or charge Ms. Tate, Cierra, Christopher or anyone else.

5.      The target of the search warrant, the person named in the warrant, Andre King, also known as "Drako" according to the warrant, did not reside in or have any connection to the family's apartment. Ms. Tate and her family had never heard of him. The family had lived in this second-floor south apartment at 6134 S. Vernon Avenue for more than two-and-a-half years.

6.      Ms. Tate and her children followed all officer instructions at all times. They did not pose any apparent, actual or possible threat to the officers whatsoever at any time. They repeatedly asked the officers why they were there and what and who they were looking for. Officers ignored all of their questions.  They refused to show or give a copy of the search warrant to Ms. Tate.  They made jokes at the family's expense.

7.      After approximately two hours of detaining the family and searching their apartment and not finding any contraband or any signs of Mr. King, officers left.  They never explained why they had been there or who they were looking for.  They did not apologize to the family.  They did not say anything.  They just left.

8.      In what is a weekly routine, Chicago police terrorized yet another innocent family of color for no reason.  Their actions toward the Tate/Harbin family were not only completely avoidable as the product of a sloppy search warrant investigation, but their display of excessive violated the family's Fourth Amendment constitutional rights.  And officers' display of excessive force was not a rogue or isolated event:  it was undertaken pursuant to the City of Chicago's systemic, unofficial policy of using excessive police force against infants, children, youth and their close relatives in the minors' presence, as set forth below.

9.      As a direct result of this incident, Ms. Tate, Mr. and Ms. Harbin now suffer serious, emotional and psychological distress, including symptoms of Post-Traumatic Stress Disorder.

## JURISDICTION AND VENUE

10.      This action arises under 42 U. S. C. § 1983 and *Monell v. Department of Social Services of the City of New York*, 436 U. S. 658 (1978).  This Court has jurisdiction pursuant to 28 U. S. C. §§ 1331 and 1343.  The Court has supplemental jurisdiction of plaintiffs' state law claims.

11.     Venue is proper pursuant to 28 U. S. C. § 1391(b).  The underlying events occurred within the Northern District of Illinois; defendant City of Chicago is a municipal corporation located within the District; and all parties reside in the District.

## PARTIES

12.     At the time of all relevant events, plaintiff Cali McCuller was an eleven-week-old girl residing with her mother at 6134 S. Vernon Avenue, second floor apartment, in Chicago, Illinois.

13.     At the time of all relevant events, plaintiff Christopher Harbin was an 18-year-old young man residing with his mother, his two sisters, and his mother's husband at 6134 S. Vernon Avenue, second floor apartment, in Chicago.  On August 5, 2019, Chris had graduated from Corliss high school in Chicago and was working five days per week at an Amazon fulfillment center on the south side.  He's pursuing his BA in computer science at Chicago State University.

14.     At the time of all relevant events, plaintiff Cierra Harbin was a 22-year-old woman residing with her mother and siblings at 6134 S. Vernon Avenue, second floor apartment, in Chicago, Illinois.  On August 5, 2019, Cierra was a full-time nanny to her baby sister, Cali, since early July when her mother recently returned to work full-time.

15.     Plaintiff Toni Tate ("Ms. Tate") is Cali, Chris, and Cierra's natural mother.  At the time of all relevant events, she resided with her children at 6134 S. Vernon Avenue, second floor apartment, in Chicago, Illinois.  She and her family had lived in the apartment for approximately two-and-a-half years.

16.     Ms. Tate is a phlebotomist who works full-time for an OB Gyn practice group at 680 N. Lake Shore Drive in Chicago.

17.    Plaintiffs are African-American.

18.    Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

19.    At the time of all relevant events, defendant Suzanne L. Niemoth (star # 17958) was a Chicago police officer assigned to the Third District, Third watch Mission Team. She was the affiant of the complaint for search warrant for Andre King and 6134 S. Vernon, second floor south apartment.  She and at least the following other defendant Chicago police officers, believed to be members of the same unit, participated in obtaining, approving, and/or executing the search warrant at plaintiffs' apartment:  Jeremy Arrington (#16330); Oscar Benavides (#4839); Colin Blades (#14679); Anthony Bruno (#1123); Yvette Carranza (#13435); Danielle Cusimano (#16619); Adrien T. Franklin (#9198); Victor Guebara (#17147); Horst E. Hegewald (#18609); Antonio Miranda (#8264); Brandan Mulligan (#10132); Sean Ryan (#13198); Jeffrey A. Shafer (#17177); Matthew J. Sieber (#10163); Curtis Weathersby (# 7866); and other, presently unknown Chicago police officers.[1]

20.    On information and belief, all or nearly all of the officers who participated in the execution of the search warrant on August 5, 2019, were Caucasian.

21.    When Chicago police officers executed their search warrant at 6134 S. Vernon Avenue, second floor south apartment, they were at all times acting under color of law

---

[1] As of the filing date of this lawsuit, plaintiffs were unable to obtain, through their pre-suit FOIA requests, the names of all involved officers.  Officers on the scene did not wear badges and nameplates, and officers flatly refused to provide plaintiffs with their names and badge numbers when asked. Consequently, plaintiffs are forced to rely on discovery in order to identify the remainder of the officers who should be defendants and will promptly amend their complaint (to dismiss as well as join appropriate officers) once they obtain complete records from defendants, including the names and official CPD file photos of all officers involved.

and within the scope of their employment as officers of the Chicago Police Department ("CPD")

for the City of Chicago.

### Overview: CPD's <u>M. O.</u> is to Use Excessive Force, Including in the Presence of Youth

22.     Chicago police officers have a *de facto* policy, widespread custom or *M. O.* of unnecessarily using force against citizens of color, including infants, children, youth and their close relatives, which traumatizes them.

23.     The 2017 United States Department of Justice investigation of the CPD concluded, among other things, that CPD has a pattern and practice of using excessive force against citizens, including children.

24.     The 2016 report of the mayoral-appointed Chicago Police Accountability Task Force ("PATF") contained substantially similar conclusions and recommended a number of specific police reforms to improve police interactions with and in the presence of youth.

25.     None of the reforms that CPD has implemented or announced to date purport to remedy or address Chicago police officers' use of excessive force when executing residential search warrants in the homes of infants, children, youth and their close relatives.

26.     The federal consent decree agreed to by the City of Chicago and the State of Illinois in 2018 did not address it.

27.     CPD's recently revised use of force policy, GO3-02, does not expressly require officers to avoid using unnecessary force against or in the presence infants, children, youth and their close relatives whenever possible and does not require officers to use a trauma-informed approach to the use of force in such situations where some police force is necessary. CPD's search warrant policy, SO9-14, was also not revised to incorporate these or similar changes.

28.     Unlike other major U.S. metropolitan police departments - such as Cleveland, Indianapolis, Charlotte, Baltimore, San Francisco and many others - CPD still does not provide any training or supervision to officers concerning youth brain development or the importance of preventing trauma to infants, children and youth and their close relatives by utilizing a trauma-informed approach to the use-of-force in situations where infants, youth or children are present.

29.     The connection between trauma and youth development and between trauma and mental and physical health is well-established.

30.     It is also well-known that many poor youth of color have already been subjected to multiple traumas in the neighborhoods and circumstances in which they live and, therefore, that police use of unnecessary force against them or in their presence only compounds their already profoundly traumatic life experiences.

## FACTS RELATING TO ALL COUNTS

### *Chicago Police Obtain a Residential Search Warrant for a Person Who Had Zero Connection with Plaintiffs or Their Apartment*

31.     At approximately 5:53PM on January 29, 2015, defendant officer Niemoth swore out and obtained a search warrant authorizing a search of Andre King, AKA "Drako," and the premises at 6134 S. Vernon Avenue, 2nd floor south apartment, in Chicago.  The warrant authorized the seizure of Heroin, any paraphernalia used in the weighing, cutting or mixing of illegal drugs, any money and records detailing illegal drug transactions, and any residency documents.

32.     Officer Niemoth's complaint for search warrant stated, entirely erroneously and based solely on unverified information from a John Doe confidential informant,

that Mr. Andre had sold heroin "several times over the last couple months" from 6134 S. Vernon Avenue, 2nd floor south apartment.

33.     As the complaint for search warrant indicates, officer Niemoth did not check out the John Doe's representation by verifying that Andre King had any connection with the address 6134 S. Vernon Avenue.

34.     The facts that a Chicago police officer alleges in a complaint for search warrant are required to be "credible and reliable." (CPD SO4-19, VI.B.a.). To this end, a Chicago police officer swearing out a search warrant under oath before a judge is required to "thoroughly conduct[]" the "investigation leading up to the need for a search warrant." (CPD SO4-19).

35.     In particular, CPD SO4-19 requires the affiant of a complaint for search warrant to *independently* investigate and verify the information provided by a John Doe confidential informant, including information about where the intended target resided or can be found.

36.     In other words, as the sworn applicant for the warrant, officer Niemoth had a duty to discover, diligently and in good faith, and disclose to the issuing warrant judge whether she had identified the correct apartment or place to be searched (and not the residence of an innocent third party, like plaintiffs).

37.     All of this was and is required because the law respects citizens' Fourth Amendment rights, including the Fourth Amendment rights of innocent citizens who are not criminal suspects.

38.     In direct violation of CPD policy and the Fourth Amendment, officer Niemoth and other officers involved in obtaining and approving the search warrant performed

zero independent investigation or surveillance to verify that Mr. Bell was selling drugs at, lived or could be found at 6134 S. Vernon, as the John Doe confidential informant told him.

39.     Defendants could have made any of a number of simple inquiries.  They could have checked their own criminal history database, the CLEAR system, as they customarily do in search warrant investigations.  They could have run a person search on Lexis Nexis.  They could have performed minimal surveillance of the building.  They could have contacted the building's owner and landlord.  They could have contacted, or asked the state's attorney to subpoena, a utility company supplying energy to the building or apartment.  They could have utilized CPD's database, Accurint, which matches addresses with names.  Officer Niemoth did none of these things.

40.     Officer Niemoth totally neglected to verify or corroborate, as required by SO4-19.  She simply trusted what the criminally active John Doe told her was true about Andre King and 6134 S. Vernon, second floor south.

41.     Consequently, her sworn complaint for search warrant was fundamentally inaccurate about who was inside and what was taking place at 6134 S. Vernon, second floor south.  In spite of what she told Judge Tristan, police did not have probable cause to believe that Mr. King was selling drugs there and, therefore, to enter and conduct a search at that address.

42.     Because officer Niemoth and other officers failed in their minimal official duty to independently investigate and verify the location of the person to be searched, theirs was not a good faith error.

43.     Similarly, on information and belief, the CPD lieutenant who approved officer Niemoth's complaint for search warrant (name currently unknown) simply "rubberstamped" it, without taking any steps to ensure that officer Niemtoh or other officers had

performed the due diligence required by CPD Special Order S04-19. Taking these vital steps was what the lieutenant was required to do.

44.     On August 5, 2019, defendant officers reasonably knew or should have known that the intended target of warrant did not reside at 6134 S. Vernon, second floor south.

45.     Moreover, as is customary in Chicago, defendant officers, in the course of obtaining and executing the search warrant, took no steps to first determine whether any minors resided in the apartment, if so what times they were unlikely to be at home, to avoid entering at times when they were likely to be present, or to deescalate themselves and their use of force tactics if they unexpectedly encountered minors in the second floor south apartment at 6134 S. Vernon. As a result, officers injured plaintiffs.

### *Officers Point Guns at the Young Family and Destroy Their Personal Property*

46.     At approximately 9:45PM on Monday, August 5, 2019, Toni Tate was getting ready for bed. She to get up and go downtown to work the next morning. Her infant daughter, Cali, who was 11-weeks-old, was sleeping peacefully in her crib in her mother's room in the family's second floor apartment. Ms. Tate's husband, who works third shift as a CNA at Loyola Medical Center, had just left for work.

47.      It was a warm, summer evening. Ms. Tate's older children, Chris and Cierra, had just gone outside to sit onto their balcony, situated directly above the front entrance to the building and facing the street.

48.     Shortly they saw at least four unmarked vehicles pull up and stop on the street in front of their building. They saw several people in plain clothes exit the vehicles and begin walking towards the entrance to their building. As they walked, they drew their guns,

cocked them, and carried flashlights pointed at the ground. Chris and Cierra also noticed two uniformed police officers.

49.     Having no inkling they were coming to their apartment and simply being the helpful, law-abiding citizens they are, Cierra called down to the group of officers and asked what was going on and if they needed to be buzzed into the building. They looked up at her but did not acknowledge or respond.

50.     Concerned, Cierra went inside to tell her mother that the police were at the building.

51.     At that moment, Ms. Tate was in her nightgown in the kitchen getting some granola to snack on and some water to drink. Ms. Tate's response was to reassure Cierra that the police "are not coming *here*." Just then, Ms. Tate heard light tapping at the apartment front door. In response, she said, "hold on," and started walking from the kitchen down the hallway towards the front door. She did not hear anyone say anything.

52.     Chris, who had stayed outside on the balcony a few seconds longer than Cierra, had heard the sound of glass breaking, realized it was the exterior, glass front entry door to the building that had been broken, and heard people rushing into the building. He then headed inside and through the front room in the direction of the kitchen to tell Cierra and his mother.

53.     He did not make it.

54.     As Chris was walking through the living room and entering the long narrow hallway near the apartment front door, approximately 10 or 15 defendant officers suddenly broke down the apartment front door, broke it off of its hinges, and poured into the apartment, directly towards Chris.

55.     The first officer through the door was carrying a large shield, a gun and flashlight.  The two officers directly behind him aimed their guns – one a rifle and the other an assault rifle – directly at Chris.  These officers were just three or four steps away from him.  Chris instinctively put his hands up and took one or two steps backwards.

56.     As they poured in the officers screamed and cursed, "SEARCH WARRANT!", "PUT YOUR HANDS UP AND GET ON THE GROUND!"  Another officer said, "GET THE F--- DOWN!"  Chris complied.  He lay flat on the floor on his stomach.  After he was laying still on the floor, an officer continued to point his gun at him.  Chris saw in the mirror near the couch that an officer was pointing a gun directly at his back at close range.

57.     Officers then handcuffed Chris behind his back, told him to stand up, searched his pockets and, finding nothing, told him to sit on the nearby couch in the front room.  Chris complied with all officer instructions.

58.     At the moment when officers broke open the front door and streamed in towards Chris, Ms. Tate was on her way to open the front door and had just passed the bathroom.  She was six or seven steps from the front door.  But the open front door blocked her view of Chris who was on the other side of the door in the front room.  As she heard officers forcefully interacting with Chris, Ms. Tate was very concerned about him.

59.     Ms. Tate then saw at least one officer running towards her with a handgun drawn and pointed directly at her.  This officer was female.

60.     Ms. Tate announced to officers, "I have a spoon."  Ms. Tate had a spoon in her right hand because she had been eating granola in the kitchen seconds earlier.

61.     The female officer yelled at Ms. Tate to "TURN AROUND!"  Then the officer handcuffed Ms. Tate while she stood in the hallway.  Immediately the handcuffs were too

tight on Ms. Tate's wrists. The officer then pulled Ms. Tate down the hallway, into the front

room, and had her sit on the couch next to her son Chris.

62.     For the next 30-45 minutes, Ms. Tate repeatedly told the officers that the

handcuffs were too tight and several times requested that they loosen them. They ignored her.

63.     Officers mentioned to Ms. Tate that they had a search warrant, and Ms.

Tate began to ask to see it. She asked them repeatedly, "Who are you looking for?" They did

not respond.

64.     During the entire detention and search, officers ignored all of the family's

questions and requests.

65.     When officers first broke in and accosted Ms. Tate in the front hallway,

Cierra, who had been following her mother on their way to the apartment front door, became

frightened for her baby sister. She peeled off and went into her mother's bedroom, jumped on

the bed and covered Cali with her body.

66.     Moments later, two officers, a white female and a black male in plain

clothes, entered her mother's bedroom and demanded that Cierra turn around and show them

what she had in her hands. She complied. Cierra turned around with Cali in her arms.

67.     When she did so, the male officer pointed his rifle directly at Cierra's

chest as she was cradling Cali in her arms and chest. The rifle was pointed at Cierra and at Cali.

Cierra was crying because the officer was pointing the gun at her.

68.     With the rifle still pointed at her, the female officer ordered Cierra to stand

up. She complied. The male officer continued to point his rifle at Cierra's chest and at Cali as

Cierra stood up with Cali in her arms.

69.     With the rifle still pointed at her and the baby, officers asked Cierra if she had anything dangerous on her, and Cierra told them to please grab the knife that was in her pocket.  They did.  The male officer continued to point his rifle at Cierra until after the female officer had gotten the knife out of her pocket.

70.     Officers then walked Cierra with Cali still in her arms to the front room, where she sat on the couch with her mother and brother.  Cierra was extremely upset and still crying because officers had pointed a gun at her and Cali.

71.     After they had been seated on the couch for approximately five minutes, a female officer entered the living room and suddenly told officers to turn on their body cameras. Ms. Tate saw an officer standing by the front door turn on his camera after the female officer gave this order.

72.     While plaintiffs were confined on the couch, two plain-clothes officers, a short African-American male and a short Caucasian female, questioned them.

73.     Officers obtained and ran plaintiffs' names, checked their IDs, and nothing came back.

74.     After approximately 45 minutes, officers finally removed the handcuffs from Ms. Tate's wrists only because Cierra happened to ask officers if Ms. Tate could hold Cali and they could cuff her (Cierra) instead.  Officers then handcuffed Cierra in front of her body.

75.     Ms. Tate continued to ask to see the search warrant and who the officers were looking for, and still they did not respond.  A uniformed officer told her a sergeant would come and tell her why officers were searching.  The sergeant never spoke to plaintiffs.

76.     Outside of the sight of plaintiffs, who were confined to the living room couch, officers gathered in the kitchen and outside in back for a meeting.  They came back inside after the meeting and began to leave.  Many left through the front door.

77.     Officers were inside Ms. Tate's residence for approximately an hour and 45 minutes.  They left at approximately 11:30PM.

78.     Close to the time they left, officers finally let Ms. Tate's husband inside the apartment, and he demanded to see the search warrant.  Officers finally gave him a copy.  Mr. McCuller saw the name on the search warrant and forcefully told officers it was not them.

79.     Before they left, officers did not explain why they were there.  They never said who they were looking for.  Officers did not explain that they had made a mistake.  They did not apologize.  They did not tell the family how to contact the city to make a request for repairs or a claim for damage.  They did not say anything.  They just took the handcuffs off of Chris and Cierra and walked out of the apartment.  Apart from the act of removing the handcuffs, the family did not even know the raid was over.

80.     Officers did not arrest or charge anyone.  They did not find any Heroin or other items listed in the search warrant, and they did not find Mr. King or anyone who knew who he was.

***Officers Damage the Family's Personal Property, Especially Chris and Cierra's Rooms***

81.     During plaintiffs' hour-and-forty-five-minute detention in the living room, officers tossed and searched a large portion of plaintiffs' apartment.

82.     As soon as Ms. Tate, Chris and Cierra were seated on the couch in the living room, they could hear officers throwing things around in Chris and Cierra's bedrooms.

Officers focused on those bedrooms. They also searched the living room. They opened and closed cabinets in the kitchen.

83.     Officers did not seem to touch Ms. Tate's bedroom, but they thoroughly tossed and tore up Chris and Cierra's bedrooms.

84.     Even though Chris' bedroom door was open, they broke the door frame, and he could not close his door.

85.     Chris' room was decorated with a display of old and new gym shoes inside shoe boxes all along the wall from the floor to the ceiling. Officers knocked it all down.

86.     Officers took everything out of Chris' bedroom closet and threw it on the floor. They dumped all of his clothes onto the floor and stepped on them. He had to throw his clothes away. They emptied the contents of his dresser drawers onto the floor. They dumped out the contents of his school book bag onto the floor.

87.      Officers also trashed Cierra's room. They threw or knocked her flat-screen TV over and onto the floor, cracking the screen. They flipped her bed. Everything that was on her bed went to the floor. They knocked down paintings that were on her walls. They threw important papers onto the floor. They dumped out the contents of her chest, including school supplies, onto the floor. They dumped all of her clothes onto the floor. Chips and sticky candy were poured over her clothes from a book bag that officers emptied. Cierra had to throw her clothes away.

88.     When the family asked who they should call to come clean up the mess, one of the officers joked, "That's a whole new search warrant."

### *Officers' Use of Excessive Force Against Ms. Tate, Chris, Cierra, and Cali Was Totally Unnecessary*

89.     Plaintiffs presented absolutely no threat, real or apparent, to the police officers entering into and searching their home.

90.     Even though they presented no threat, officers repeatedly pointed their guns at them, and other officers did not ask those pointing guns at the children and their mother to stop doing it.

91.     Moreover, plaintiffs posed no threat to officers after they discovered that no one who looked anything like the intended target of the warrant was in the apartment.

92.     Plaintiffs have been harmed by officers' unnecessary pointing of guns, unlawful detention, unlawful search of their persons and home, and their destruction of plaintiffs' personal property.

### Officers' Unnecessary Uses of Force Traumatized Ms. Tate, Chris and Cierra

93.     Chicago police officers' terrorizing conduct towards plaintiffs caused them immediate, serious and lasting emotional and psychological distress.

94.     Prior to August 5, 2019 Ms. Tate, Chris and Cierra were happy and healthy people in a close, loving family. Prior to this date, they had suffered no emotional or psychological trauma of any kind in their lives. This all changed with defendants' actions.

95.     Throughout their encounter with police, they were terrified. Cierra was crying. Based upon what they witnessed, they believed officers were going to harm Chris and Cali.

96.     Ever since the incident, they have continued to re-live, in various ways, how terrified they were that day.

97.     Ms. Tate had nightmares every night at first and now has them every other night. She has a recurring nightmare that officers keep coming back with different search

warrants.  In her dreams and in her memory, she hears the apartment front door breaking open over and over.  She jumps up out of bed during these nightmares.  She does not sleep soundly. She gets up and comes out of her room often during the night.  She is overly concerned about Chris and Cierra and texts them whenever they are out of the house.  She is also worried officers will come back when she's at work.  She is worried about Chris and Sierra when they are outside and inside the house, both.

98.     Cierra remains very disturbed because officers pointed a long rifle directly at her chest and Cali while she was holding Cali in her arms.  She had nightmares every night immediately following the incident and now has them two or three times per week.  She dreams she's holding Cali and an officer is pointing a gun at them.  She also thought something was going to happen to her brother.

99.     Cierra now feels unsafe both in her apartment and, at the same time, is afraid to leave the house to go to the store because she fears that, if the police see them, they will do something to her and her brother.  She is even scared to go out onto the balcony porch of her apartment.

100.    Chris now feels like the police are out to get him.  Before, he thought the police were "cool people out doing good in the community."  Now, he sees a whole different version of them.

101.    All plaintiffs now feel nervous, jumpy, and "on edge."

102.    Plaintiffs continue to experience and exhibit, unabated, these and other signs of serious emotional and psychological trauma and distress.

103.    On information and belief, plaintiffs have, or have many of the symptoms of, Post-Traumatic Stress Disorder.

104.     As a direct result of officers' conduct, plaintiffs are now being medically assessed for trauma inflicted by the Chicago police.

105.     On information and belief, plaintiffs will require counseling in order to cope with the long-term, psychological injuries inflicted by defendants' display of excessive force.

106.     Officers' shocking actions of repeatedly pointing and training loaded guns at close range on an infant, young people and their mother and detaining them for two hours for no reason constituted serious abuses of power and authority.

107.     Officers' actions – including their inaction in the form of failing to intervene to request that fellow officers stop using excessive force - were directed towards an infant, women, and young people. Their sensitivity and vulnerability to such trauma-inducing violence was or should have been known to officers.

108.     Officers' conduct was undertaken pursuant to and is part of the long-standing and widespread pattern and practice, *de facto* policy or *MO* of Chicago police officer use of excessive force noted above, which includes the use of excessive force against and/or in the presence of children and young people of color.

## COUNT I – 42 U. S. C. § 1983 *MONELL* POLICY CLAIM
## AGAINST THE CITY OF CHICAGO
### (All Plaintiffs)

109.     Plaintiffs re-allege all paragraphs 1-108 above, including the *Monell*-related allegations of paragraphs 22-30 and 108 above and 147-161 below, and incorporate them all into this count. They assert this claim against defendant City of Chicago.

110.     Defendant officers' use of excessive force against and in the presence of plaintiffs was directly and proximately caused by one or more of the following three, specific,

long-standing, interrelated, *failures* of official policy, *lack* of official policy, *de facto* policies, widespread practices, and/or customs of the City of Chicago: 1) a pattern and practice of using unnecessary or excessive force against infants, children, youth and/or their close relatives in the minor's presence; 2) a systemic failure to investigate and discipline and/or otherwise correct allegations/incidents of officer excessive force against infants, children, youth and/or their close relatives in the minor's presence; and 3) an absence of official policy and training to avoid the unnecessary or excessive use of force against infants, children, youth and/or their close relatives in the minor's presence. Each of these policies existed for more than six years prior to August 5, 2019 ("the *Monell* period").

111. First, defendant City of Chicago has a long-standing, pervasive practice and custom of failing to adequately investigate, intervene with and discipline or otherwise correct officers for the use of excessive force against infants, children, youth or their close relatives in the minor's presence.

121. This set of City's widespread practices or customs directly encouraged, authorized and caused officers' conduct toward the children. The City's historical failure, leading up to August 5, 2019, to properly intervene in, investigate and discipline officer excessive force, especially excessive force against infants, children, youth and/or their close relatives in the minor's presence, caused officers to act without appropriate restraints in the presence of Cali.

122. This was facilitated by defendant officers' failures to timely turn on their body cameras coupled with a complete lack of official disciplinary consequences for officers, like defendants, who do not wear their bodycams or who turn them on late, in violation of the CPD mandate to do so.

123.    The City was on notice of each of these failures of official policy from the specific conclusions reached by and the data contained in the 2017 U. S. Department of Justice investigative and the PATF reports (citations above).

124.    Second, defendant officers' conduct towards and in the presence of Cali was undertaken as a direct consequence of defendant City of Chicago's long-standing failure to have *any* affirmative, official policies and/or training explicitly requiring officers to avoid using unnecessary or excessive force against infants, children, youth and/or their close relatives in the minor's presence whenever possible.

125.    Even after the findings of the U. S. Department of Justice investigation and the Mayor's PATF were known to City policy makers, the City failed to implement or announce implementation of any reforms that purported to remedy the pattern and practice of unnecessary use of force against infants, children, youth and/or their close relatives in the minor's presence - a failure which amounted to a deliberate choice not to take action to prevent the violation of plaintiffs' constitutional rights.  City and CPD's failure to implement these explicit policies, reforms and priorities was a cause of the injuries to plaintiffs.  Specifically, this lack of official policies, training, and reforms includes:

a.    The continued absence of any provision in CPD's official use of force policy that would explicitly guide or require officers to avoid using force against infants, children, youth and/or their close relatives in the minor's presence, or to use a trauma-informed approach to the use of force in situations where minors or youth are present, and some force may necessary;

b.    CPD's continued failure to add, in its official use-of-force training curriculum and/or its on-the-job training and supervision of officers, any explicit guidance or

requirement that officers should avoid using force against infants, children, youth and/or their close relatives in the minor's presence, or to use a trauma-informed approach to the use of force in situations where minors are present and some force may be necessary;

c.      CPD's continued failure to require officers seeking residential search warrants to make reasonable efforts before obtaining and/or executing the warrant to determine, through investigation and surveillance, (i) whether minors reside in the residence, (b) to avoid entry and search at times when minors are likely to be present (ii) to de-escalate themselves or change tactics when they unexpectedly encounter infants, children, or youth, and/or (iii) to take other precautions to avoid traumatizing minors and their close relatives, such as avoiding pointing guns at or placing parents and caretakers in handcuffs in the children's presence;

d.      CPD's rebuff, both before and since the U. S. Department of Justice and PATF reports were released, of national and local legal and/or community organizations that have offered to provide training on trauma-informed policing with children and/or offered model use-of-force policies that included explicit provision for avoiding the unnecessary use of force against and in the presence of children; and

e.      City's and CPD's refusal or failure to propose or agree to any explicit protections for children from excessive force or any provisions requiring a trauma-informed approach to policing children in the federal consent decree it negotiated with the State of Illinois.

126.    Third, the City's lack of official policies to protect children from unnecessary officer use of force, combined with its failure to hold accountable officers who use unnecessary force involving minors, have resulted in a *de facto* City policy and practice of using

unnecessary or unreasonable force against young children and youth, as concluded by the U. S. Department of Justice investigation into the Chicago Police Department and the PATF. The excessive force used against or in the presence of plaintiffs was an example of and the result of this *de facto* policy.

127. Through their combined failures, before and after notice, to enact official policies that protect children from unnecessary force and to hold accountable officers who use excessive force against children, the City has led police officers to be confident that such actions are acceptable and will not be challenged, investigated or disciplined by CPD, CPD's Bureau of Internal Affairs ("BIA"), the Chicago Police Board, the Independent Police Review Authority ("IPRA") or the Civilian Office of Police Accountability ("COPA"). These past failures directly authorized, encouraged and emboldened defendant officers' conduct against and in the presence of plaintiffs, providing them a general license to use excessive force involving minors whenever it suits them.

128. Through their combined failures, before and after notice, to enact official policies protecting children from unnecessary force and to hold accountable officers who use excessive force against children, final City of Chicago policy-makers – including the Superintendent of police, the Administrator of IPRA (now COPA), the head of CPD's BIA, the Mayor, and the Chicago City Council – condoned, approved, facilitated, encouraged and perpetuated a *de facto* City policy and practice of unnecessary or excessive force against infants, children, youth and/or their close relatives in minors' presence.

129. Additionally, the violation of the children's Four Amendment rights against illegal search was also caused by widespread City practices and *de facto* City policies. In particular, CPD has a *de facto* policy of applying for and executing residential search warrants

based on inaccurate, unreliable and unverified information, with the consequence that half or a majority of all warrants executed are "negative," i.e., they result in no arrest. But they consistently result in excessive force, illegal search, terror and lasting trauma to innocent residents, including infants, children, youth and their close relatives.

130.    CPD fails to properly supervise, investigate, discipline and otherwise hold accountable officers who apply for and execute residential search warrants based on inaccurate, unreliable and unverified information.

131.    Nor does CPD audit, monitor or track residential search warrants in the aggregate, even on a sample basis, in order to identify and evaluate investigative practice issues (such as whether officers are doing enough to verify the current or correct address for the target) and improve the accuracy and reliability of search warrant investigations, despite the fact that such measures could boost "positive" warrant results and inflict less trauma on innocent bystanders, including young children.

132.    Finally, during all times relevant to the incident involving plaintiffs, a "code of silence" pervaded the police accountability system in Chicago, including CPD's BIA, the Chicago Police Board, IPRA and COPA, contributing to these agencies' collective failure to properly investigate and discipline officer excessive force, including excessive force against infants, children, youth and/or their close relatives in the minor's presence. Unjustified exemptions from the bodycam mandate and a complete lack of official discipline and accountability for officers who do not wear or do not turn on their bodycams reinforce the code of silence. Defendant officers' conduct toward plaintiffs, including their failure to intervene and failure to report the actions of their colleagues, was the direct result of the long-standing and systematic code of silence at work in the City's police investigative and disciplinary systems.

133.    By means of its pervasive customs and practices above and its failures, after notice, to remedy officers' use of unnecessary force against infants, children, youth and/or their close relatives in the minor's presence, defendant City of Chicago has manifested and manifests deliberate indifference to the deprivation of plaintiffs' constitutional rights.

134.    One or more of these three polices, practices and customs collectively, directly and proximately caused the violations of plaintiffs' constitutional rights set forth above and below and the resulting injuries, such that the City of Chicago is liable for officers' use of excessive force against them and/or in their presence.

### The City of Chicago's <u>De Facto</u> Policies Resulted in Violations of Plaintiffs' Constitutional Right to be Free of Excessive Force and Illegal Search

135.    Officers' conduct toward plaintiffs constituted excessive force, in violation of their rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

136.    Under the circumstances, officers' displays of force against and in the presence of young children was totally unnecessary, unreasonable and unjustifiable.

137.    Under the circumstances, officers' uses of force against plaintiffs, undertaken in the presence of and witnessed by other plaintiffs, was totally unnecessary, unreasonable and unjustifiable.

138.    Officers failed to intervene to stop any use of force.

139.    Officers' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to plaintiffs' constitutional rights.

140.    Officers' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

141.    The officers' misconduct was undertaken pursuant to and as the direct and proximate result of the Defendant City of Chicago's *de facto* policy, failures of official policy,

absences of affirmative policy, and pervasive, long-standing practices and customs, as set forth above, such that defendant City of Chicago is liable for officers' use of excessive force against and in the presence of plaintiffs.

142.    As the direct and proximate result of officers' misconduct, plaintiffs have suffered and continue to suffer severe, long-term emotional and mental distress and trauma, including lasting or permanent psychological injury.

143.    One or more officers had a reasonable opportunity to prevent or stop the violations of plaintiffs' constitutional rights but stood by and failed to take any action.

144.    Officers' inactions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

145.    As set forth above, the officer misconduct was undertaken pursuant to the *de facto* policies, long-standing and pervasive practices and customs of defendant City of Chicago, such that the City of Chicago is also liable for officers' failure to intervene.

146.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### COUNT II – UNLAWFUL SEARCH – INVALID WARRANT - 42 U. S. C. § 1983
### (All Plaintiffs)

147.    Plaintiffs Jaden, Jeremy and Justin re-allege paragraphs 1 – 108 above and incorporate them into this count.  They assert this claim against defendant officers and any as yet unknown officers who participated in obtaining the search warrant for their apartment.

148.    Defendant officers unreasonably approved, obtained and executed a search warrant for a person who, officers knew or should have known, had no connection with plaintiffs' address, a fact which invalidated the warrant from the start, prior to execution.

149.     Officers' subsequent unauthorized entry and search violated plaintiffs' Fourth Amendment right to be free from unreasonable searches of their persons and homes.

150.     As the sworn applicant for the warrant, officer Niemoth and those who assisted him had an official duty to discover and disclose to the issuing magistrate whether she had identified the correct address or place to be searched and not the residence of an innocent third party.

151.     Officer Niemoth and other defendant officers reasonably knew or should have known that the intended target(s) of the warrant would not be found at plaintiffs' address.

152.     Officer Niemoth and the other officers had an official duty to reasonably investigate and verify information they received from the felonious John Doe about the target's whereabouts.

153.     Such an inquiry was so simple to make by means of the sources listed above.  Officer Niemoth and other officers had multiple sources of information available to them at the time, had they bothered to use them.

154.     But, on information and belief, officer Niemoth and others recklessly did not conduct any investigation or verification or failed to conduct a reasonable one.

155.     Consequently, in their complaint for search warrant defendant officers identified the wrong address, plaintiffs' address, a place they never had probable cause to enter and search.  Because officers recklessly and utterly failed to independently investigate and verify the place to be searched, theirs was not a good faith error.

156.     A CPD Lieutenant approved officer Niemoth's application for search warrant without ensuring that she and other officers had performed the due diligence required by CPD Special Order S04-19.

157.    Officers' actions in these respects were objectively unreasonable and were undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

158.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

159.    Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs.  Defendant officers' shocking inaction in failing to perform required and basic reasonable due diligence to verify the correct location for a search warrant before raiding and searching citizens' residence constituted an abuse of power and authority.  Defendant officers' actions – of relying solely on location information provided by a John Doe confidential informant who was a convicted felon with numerous prior arrests for handling and selling narcotics and not conducting their own investigation and surveillance to verify the address - were directed towards honest, hard-working citizens who were totally innocent of all criminal conduct.

160.    Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others.  Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

161.    In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, defendants' conduct merits an award of punitive damages.

### COUNT III – UNLAWFUL SEARCH – UNREASONABLE MANNER OF ENTRY AND SEARCH – 42 U. S. C. § 1983
### (Minor Plaintiffs)

162.    Plaintiffs Jaden, Jeremy and Justin re-allege paragraphs 1 – 108 above and incorporate them into this count.  They assert this claim against all defendant officers who entered and/or searched their apartment.

163.    The manner in which officers conducted their entry into and search of plaintiffs' apartment were objectively unreasonable, in violation of Plaintiffs' Fourth Amendment rights.

164.    For example, when these officers entered plaintiffs' apartment, they did not knock or announce themselves or their office in circumstances where it was required, they pointed guns at plaintiffs from close range, they screamed and cursed at plaintiffs, and they intentionally damaged or destroyed plaintiffs' personal property.

165.    Further, it was unreasonable for officers to detain plaintiffs in handcuffs for two hours, an unreasonable length of time and in an unreasonable and humiliating manner.

166.    Officers' manner of entry and search was objectively unreasonable in these and other ways and was undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

167.    Under the circumstances, officers had reasonable alternative law enforcement techniques available to them for effective entry and search.

168.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

169.    Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs.  Defendant officers' shocking displays of force against a totally unarmed family with an infant constituted an abuse of power and authority.  Defendant officers' actions

set forth above were directed towards unarmed citizens who were fully compliant and cooperative and innocent of all criminal conduct.

170.    Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others.  Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

171.    In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, defendants' conduct merits an award of punitive damages.

## COUNT IV – FALSE ARREST AND FALSE IMPRISONMENT – 42 U. S. C. § 1983
### (All Plaintiffs)

172.    Plaintiffs re-allege paragraphs 1 – 108 above and incorporate them into this count.  They assert this claim against the defendant officer(s) who detained them and those who declined to intervene.

173.    Officers arrested and imprisoned plaintiffs when, (a) without a warrant for their arrest and without probable cause to arrest them, they handcuffed them and confined them to the couch in the front room for approximately two hours.

174.    Officers' actions constituted a violation of plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures.

175.    When officers confined plaintiffs, they unlawfully deprived them of their liberty to move about, despite the fact that they had not done nothing illegal, were not a safety threat, and that officers had no probable cause for their arrest and imprisonment.  This violated plaintiffs' rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

176.     Moreover, one or more officers had a reasonable opportunity to prevent or stop the violations of plaintiffs' constitutional rights but stood by and failed to take any action.

177.     Through physical force and the invalid use of legal authority, officers acted to arrest, restrain and confine plaintiffs to a bounded area.

178.     Plaintiffs were acutely aware of and were harmed by officers' confinement, as detailed above.

179.     Officers' actions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

180.     As the direct and proximate result of officers' misconduct, plaintiffs suffered and continued to suffer injury and harm.

## COUNT V – UNCONSTITUTIONAL SEIZURE OF PROPERTY - 42 U. S. C. § 1983
### (Hardin Plaintiffs)

181.     Plaintiffs Chris and Cierra Hardin incorporate paragraphs 1 – 108 above and assert this claim against defendant officers who participated in the search of plaintiffs' residence.

182.     As set forth above, defendant officers unnecessarily and willfully damaged or destroyed plaintiffs' personal property during the course of their search.  Defendant officers took these actions without any lawful basis and without ever returning plaintiffs' property to them or paying them compensation for damage or destruction they caused.

183.     Defendant officers' actions constituted an unreasonable seizure of plaintiffs' property, in violation of their rights under the Fourth Amendment and Fourteenth Amendments to the U. S. Constitution, as well as a deprivation of property without due process of law, in violation of their rights under the Fourteenth Amendment.

184.     Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful, malicious and reckless indifference to plaintiffs' constitutional rights.

185.     Defendants' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

186.     As a result of defendant officers' misconduct described in this Count, plaintiffs have suffered injury, including deprivation of their right to property, financial harm and emotional distress.

### COUNT VI – ASSAULT – STATE LAW
**(All Plaintiffs)**

187.     Plaintiffs re-allege and incorporate paragraphs 1 – 108 above in this count. They assert this claim against defendant City of Chicago.

188.     The actions of officers set forth above, including pointing guns at close range at the plaintiffs, created reasonable apprehensions in plaintiffs of immediate harmful contact to plaintiffs' persons.

189.     The officers intended to bring about apprehensions of immediate harmful contact in plaintiffs or knew that their actions would bring about such apprehensions.

190.     In the alternative, the conduct of defendant was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

191.     The conduct of defendant in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

192.    The officers' actions were the direct and proximate cause of plaintiffs' apprehensions.

193.    Plaintiffs have been seriously harmed by officers' actions.

## COUNT VII – FALSE ARREST AND FALSE IMPRISONMENT– STATE LAW
### (All Plaintiffs)

194.    Plaintiffs re-allege paragraphs 1 – 108 above and incorporates them into this count.  They assert this claim against defendant City of Chicago.

195.    Officers arrested and imprisoned plaintiffs when, (a) without a warrant for their arrest and without probable cause to arrest them, they (b) handcuffed them and confined them the couch in the front room for two hours.

196.    Officers' actions restrained plaintiffs and confined them to a small, bounded area.

197.    Officers intended to restrain and confine plaintiffs to bounded areas within or outside the house.

198.    In the alternative, the conduct of defendant was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

199.    The conduct of defendant officers in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

200.    Officers' actions caused the restraint and confinement of plaintiffs to a small, bounded area within their residence.

201.    Plaintiffs were harmed by officers' actions in restraining and confining them, as detailed above.

## COUNT IX - INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – STATE LAW
### (Plaintiffs)

202.    Plaintiffs re-allege and incorporate paragraphs 1 – 108 above in this count and assert this claim against defendant City of Chicago.

203.    The actions, omissions and conduct of officers set forth above were extreme and outrageous and exceeded all bounds of human decency.

204.    Officers' actions, omissions and conduct above were undertaken with the intent to inflict and cause severe emotional distress to plaintiffs, with the knowledge of the high probability that their conduct would cause such distress, or in reckless disregard of the probability that their actions would cause such distress.

205.    Officers, who occupied positions of special trust and authority, knew, had reason to know or believed that plaintiffs' family, which included an infant and young people, were especially vulnerable and fragile.

206.    As a direct and proximate result of officers' extreme and outrageous conduct, plaintiffs suffered and continue to suffer long-term, severe emotional distress and trauma.

207.    In the alternative, officers owed plaintiffs a duty of care that they breached when they pointed guns at them, handcuffed them, confined them to the couch in the living room for two hours, and damaged or destroyed their personal property.  Plaintiffs are direct victims of officers' negligent infliction of emotional distress.

34

208. In the alternative again, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

209. The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries. Numerous prior injuries have occurred to civilians in this context. Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

214. Officers' conduct was a proximate cause of plaintiffs' injuries and their extreme, severe, long-term emotional distress and trauma.

### COUNT X - TRESPASS – STATE LAW
### (All Plaintiffs)

215. Minor plaintiffs re-allege paragraphs 1 – 108 above and incorporate them in this count. Plaintiffs assert this claim against defendant City of Chicago.

216. By obtaining and executing the search warrant when officers did not have probable cause to believe that the target resided at the address given them by the John Doe, officers physically invaded plaintiffs' right to and enjoyment of exclusive possession of their residence.

217. In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

218. The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries. Numerous prior injuries have

occurred to civilians in this context. Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

219. Officers' actions caused a physical invasion of plaintiffs' residence.

220. Plaintiffs were harmed by officers' physical invasion of their residence.

## COUNT XI – *RESPONDEAT SUPERIOR* – STATE LAW
### (All Plaintiffs)

221. Plaintiffs re-allege paragraphs 1-108 and 187 – 220 above and incorporate them into this count. Plaintiffs assert this claim against defendant City of Chicago.

222. In committing the acts and omissions alleged above, officers were at all times members and agents of CPD and the City of Chicago and were acting within the scope of their employment.

223. Defendant City of Chicago is, therefore, liable as principal for all common law torts committed by its agents within the scope of their employment.

## COUNT XII – INDEMNIFICATION – STATE LAW
### (All Plaintiffs)

224. Plaintiffs re-allege and incorporate paragraphs 1-117 and 187 – 220 above. Plaintiffs assert this count against defendant City of Chicago.

225. Illinois law, 745 ILCS 10/9-102, directs public entities to pay any common law tort judgment for compensatory damages for which employees are held liable within the scope of their employment activities.

226. Involved officers were and are employees of the City of Chicago who acted within the scope of their employment when committing the actions and omissions detailed above.

## PRAYER FOR RELIEF (ALL COUNTS)

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendant on each count for:

a.   Compensatory damages;

b.   Punitive damages where pled in the counts above;

c.   Reasonable attorney's fees and litigation costs and expenses; and

d.   Such other or further relief as the Court deems just.

Respectfully submitted,

s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com

## JURY DEMAND

Plaintiffs demand trial by jury.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

## NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

s/Al Hofeld, Jr.

Al Hofeld, Jr.


## NOTICE OF FILING AND CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

        I, Al Hofeld, Jr., an attorney for plaintiffs, hereby certify that on November 14, 2019, filing and service of the foregoing ***Complaint*** was accomplished pursuant to ECF as to Filing Users, and I shall comply with LR 5.5 and the Federal Rules of Civil Procedure as to service on any party who is not a Filing User or represented by a Filing User.

s/Al Hofeld, Jr.<br>
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com