## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| TONI TATE, for herself and on behalf of her minor child, CALI MCCULLER; CHRISTOPHER HARBIN; AND CIERRA HARBIN, | |
| Plaintiffs, | No. 19 C 7506 |
| v. | Judge Thomas M. Durkin |
| THE CITY OF CHICAGO; SUZANNE L. NIEMOTH; JESSE ALVAREZ; JEREMY D. ARRINGTON; OSCAR BENAVIDES; ANTHONY P. BRUNO; YVETTE CARRANZA; DANIELLE M. CUSIMANO; VICTOR J. GUEBARA; HORST E. HEGEWALD; BRENDAN T. MULLIGAN; SEAN RYAN; JEFFERY A. SHAFER; MATTHEW J. SIEBER; CURTIS L. WEATHERSBY; and OTHER CURRENTLY UNKNOWN CHICAGO POLICE OFFICERS, | |
| Defendants. | |

### MEMORANDUM OPINION AND ORDER

Toni Tate and her children allege that certain Chicago Police Officers violated their civil rights and state law in obtaining and executing a search warrant of their apartment. The individual officers and the City of Chicago have moved to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). R. 69. That motion is denied.

### Legal Standard

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must

provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

The first several minutes of Defendants' search of Plaintiffs' apartment were recorded by the defendant officers' body worn cameras. Plaintiffs reference those videos in their complaint and Defendants attached the videos to their motion. Plaintiffs do not object to their consideration and the Seventh Circuit has held that it is proper to consider videos that are incorporated by reference in a complaint on a motion pursuant to Rule 12(b)(6). *See Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir.

2013). So in addressing Defendants' motion, the Court considers facts readily apparent from the videos along with Plaintiffs' allegations.

## Background

Defendant Officers Suzanne Niemoth, Sergeant Anthony Bruno, Danielle Cusimano, and Horst Hegewald conducted the investigation that led to the search of Plaintiffs' apartment. Defendant Lieutenant Jesse Alvarez signed-off on the affidavit Officer Niemoth prepared supporting the application for a search warrant. The affidavit states in relevant part:

> On [August 4, 2019] [a confidential informant] related to [Niemoth] that heroin was being sold by "Drako" a male black, approximately 55-60 [years] old, at 6134 S. Vernon Ave., 2nd floor South apartment. [The informant] related on [August 4, 2019] he went to 6134 S Vernon Ave to the 2nd floor South apartment and asked "Drako" for two bags of "D", a street term for heroin. "Drako" then left [the informant's] sight and returned a short time later with 2 small clear ziplock bags of suspect heroin in it. [The informant] then tendered [cash] to "Drako" who then tendered the 2 small clear ziplock bags of suspect heroin to [the informant].
>
> [The informant] stated that [he] knows the contents of the bags that [he] received from "Drako" to be heroin because [the informant] has been using heroin for over twenty years and is familiar with the color and consistency of the heroin as well as the methods of packaging it. [The informant] further related that [he] has purchased heroin from "Drako" at 6134 S Vernon Ave, several times over the last couple months and has each time received the same euphoric high.
>
> On [August 4, 2019], [Niemoth] then, accompanied by [the informant], went to the address of 6134 S Vernon Ave where [the informant] pointed to the 2nd floor South apartment of a red brick multi-unit building and identified it as the location [he] purchased the heroin from on [August

3

4, 2019]. [Niemoth] observed 6132-6134 clearly visible on the front of the building and determined 6134 to be the address of the South apartments. [Niemoth] then conducted an ICLEAR search for "Drako" and located Andre King . . . fitting the nickname and physical description provided by [the informant]. [The informant] was then shown an ICLEAR photo of Andre King . . . and positively identified Andre King . . . as the "Drako" who [the informant] purchased heroin from on [August 4, 2019].

Based upon the above stated facts [Neimoth] believes that probable cause does exist to conduct a search of Andre King . . . also known as "Drako" . . . and the 2nd floor South apartment of the red brick 3-story multi-unit building located at 6134 S Vernon Ave[.]

R. 69-1 at 3-4. The warrant application also states that the informant "was brought before" the judge who issued the warrant, "sworn to the contents of the complaint and made available for questioning." *Id.* at 4. The document also states that the informant's "criminal history, including possible pending investigations if any, has been presented and made available to the undersigned judge." *Id.*[1]

The investigating officers (except for Alvarez), along with the other named defendants, executed the warrant shortly before 10 p.m. on August 5, 2019, one day after the informant claimed to have bought drugs there. As the officers walked towards the building's entrance, plaintiffs Cierra Harbin (22-years-old) and Christopher Harbin (18-years-old) were seated on the balcony over-looking the

---

[1] In a footnote in their brief, Defendants mention that defendant Officers Cusimano and Hegewald, under Sergeant Bruno's supervision, used the informant to conduct a controlled buy at Plaintiffs' residence. *See* R. 69 at 11 n.10. Notably, the officers did not see fit to include this information in the affidavit supporting the warrant application. In any case, while this information is relevant, it is a factual contention outside the complaint and the Court will not consider it on this motion to dismiss.

4

entrance. Plaintiffs allege that Cierra called down to the officers and offered to let them in the building. R. 60 ¶ 62. The officers looked at her but did not respond. *Id.*

The officers' body camera videos show that the officers broke through the glass entrance door and entered the apartment building's entryway. After they broke the glass door they verbally announced the presence of the Chicago Police Department as they entered the vestibule. The officers walked up the stairs with their guns drawn and announced the presence of the Chicago Police Department outside Plaintiffs' apartment door. The videos show that about five seconds after the announcement, Defendants broke through Plaintiffs' apartment door.

The videos also show that upon Defendants' entrance into the apartment, Plaintiffs were fully compliant with the officers' commands. Defendants ordered plaintiff Christopher Harbin to the floor at gunpoint and handcuffed him. Defendants also handcuffed Tate. Plaintiff Cierra Harbin ran into a bedroom to gather and protect her 11-week-old sister, plaintiff Cali McCuller. Plaintiffs allege that the officers pointed their guns at Cierra as she held Cali, but the videos do not clearly show this. The videos do show that the officers had their guns in hand as they initially secured the apartment. The family was soon led to the living room where they were seated for the duration of the search. The videos show that several minutes into the search the officers were ordered to turn off their cameras, so the remainder of the search was not recorded.

Plaintiffs allege that the search lasted nearly two hours. R 60 ¶ 92. They allege that they remained handcuffed the entire time, except that Cierra and then Tate were

5

permitted to hold baby Cali, one at a time. Plaintiffs allege that Defendants destroyed various property in Christopher's and Cierra's bedrooms during the course of their search. Defendants found nothing in the apartment that would corroborate the confidential informant's statement that provided the basis for the warrant.

Plaintiffs make their claims in the following eleven counts:

*Count I* by Plaintiff Cali for unnecessary force against the City of Chicago, alleging individual defendant officers pointed their guns at her;

*Count II* by all Plaintiffs for an unlawful search, alleging an invalid warrant, against defendants Niemoth, Cusimano, Hegewald, Bruno, and Alvarez;

*Count III* by all Plaintiffs for an unlawful search, alleging unreasonable manner of entry and search, against all individual defendants except Alvarez;

*Count IV* by all Plaintiffs for false arrest and imprisonment against defendants Weathersby, Miranda, Benavides, Niemoth, Cusimano, and Bruno;

*Count V* by Christopher and Cierra Harbin for unconstitutional seizure of property, against all individual defendants except Alvarez;

*Count VI* by all Plaintiffs for assault in violation of state law against Weathersby, Miranda, Niemoth, Cusimano, Bruno, Arrington, Carranza, Mulligan, and Sieber;

*Count VII* by all Plaintiffs for false arrest and false imprisonment in violation of state law against Weathersby, Miranda, Benavides, Niemoth, Cusimano, and Bruno;

*Count VIII* by all Plaintiffs for intentional infliction of emotional distress in violation of state law against all individual defendants except Alvarez;

*Count IX* by all Plaintiffs for trespass in violation of state law against all individual defendants except Alvarez;

*Count X* by all Plaintiffs for respondeat superior liability against the City of Chicago for the individual defendants' state law violations; and

*Count XI* by all Plaintiffs for indemnification by the City of Chicago under state law.

## Analysis

Defendants seek dismissal of all claims. They make five primary arguments: (1) the videos contradict Plaintiffs' claim that the officers pointed their guns at Cali; (2) Cali was not sufficiently aware that guns were pointed at her, so she could not have been "seized" for purposes of the Fourth Amendment and subjected to excessive force; (3) the individual officers are entitled to qualified immunity for reliance on the warrant; (4) the individual officers are entitled to qualified immunity for their manner of entry and search; and (5) Plaintiffs have not alleged that Cali suffered damages.

## I.    Excessive Force (Count I)

### A.    Plausibility

Plaintiffs claim that the City is liable for excessive force because the individual officers pointed their guns at Cali. Defendants concede that a police officer pointing a gun at a person who poses no threat can constitute excessive force. *See Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009). But Plaintiffs do not dispute Defendants' contention that the videos do not show any of the individual officers pointing their guns at Cali. For this reason, Defendants argue that the videos "incontrovertibly contradict" Plaintiffs' allegation that Cali had a gun pointed at her, and so the excessive force claim should be dismissed. *See Bogie*, 705 F.3d at 609

7

(holding that a video which "incontrovertibly contradicts" allegations is a sufficient basis to dismiss claims that based on those allegations.)

Yet, Defendants also concede that the video leaves room for the "logical possibility" that the officers pointed their guns at Cali. *See* R. 89 at 5. This concession acknowledges that the videos only provide a few narrow visual perspectives of the incident. None of the videos is trained on Cali for the entire relevant time period. Indeed, Cali appears in only relatively small portions of the videos, much of which is after the moments when a gun was allegedly pointed at her. And even when Cali appears on a video, it is not always possible to discern whether a gun is being pointed at her. For instance, the videos often do not reveal what the officer wearing the camera is doing with their gun because the officer's hands are out of the frame. Additionally, the officers were moving quickly, and the cameras did not linger on other officers for extended periods of time. Consequently, there appear to be multiple gaps in the perspectives captured by the cameras. At bottom, if—as Defendants concede—the videos leave open the possibility that a gun was pointed at Cali, then the videos do not "incontrovertibly contradict" the allegations.

Defendants argue, however, that a "possible" allegation is insufficient to state a claim because allegations must be plausible. *See Iqbal*, 556 U.S. at 678 (the "plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully"). But just because Defendants have conceded that it is *possible* that a gun was pointed at Cali, does not mean that the allegation must be characterized as *merely* possible. Plaintiffs were present during the incident. They have personal

knowledge of what happened. And they allege that officers pointed their guns at Cali. The allegation that officers who broke into an apartment with guns drawn also pointed those guns at the occupants they encountered is entirely plausible. Indeed, the videos clearly show that the officers pointed their guns at Christopher. *See* Ex. M (video) QH000011 at 04:03. Defendants argue that Plaintiffs "cannot *show*" that the officers pointed their guns at Cali. R. 89 at 7 (emphasis added). But even though the videos do not clearly show a gun pointed at Cali, Plaintiffs do not have a burden to show or prove facts at this stage of the case. And the facts that are readily apparent from the videos do not undermine the plausibility of Plaintiffs' allegation that a gun was pointed at Cali. Therefore, the Court rejects Defendants' argument that Count I should be dismissed based on the videos.

### B. Seizure

Defendants also argue that Count I should be dismissed because Plaintiffs do not plausibly allege that Cali was seized. Excessive force is a form of unreasonable seizure in violation of the Fourth Amendment. *See Baird*, 576 F.3d at 344. Generally, the physical injury suffered by a victim of excessive force also constitutes the "seizure" required to state the claim. However, use of force can also be excessive without physical injury, such as when an officer points a gun at a person who poses no threat. *Id.* A seizure also occurs in such circumstances because a reasonable person held at gunpoint would not believe they were "free to leave" under the circumstances. *See Jacobs v. City of Chicago*, 215 F.3d 758, 772 (7th Cir. 2000).

Citing no authority, Defendants argue that Tate cannot state a claim for excessive force on Cali's behalf because an 11-week-old child is incapable of having a reasonable belief about her freedom to leave. *See* R. 69 at 9. But the standard addresses not what a particular plaintiff actually believed, but what a "reasonable person" would believe under the circumstances. And the Seventh Circuit has found that children, including infants, can state claims for illegal seizures, even though their individual ability to comprehend the circumstances is not certain. *See Hernandez v. Foster*, 657 F.3d 463, 474 (7th Cir. 2011) (15-month-old); *Doe v. Heck*, 327 F.3d 492, 510 (7th Cir. 2003) (11-year-old); *see also Hernandez v. Foster*, 2009 WL 1952777, at \*4 (N.D. Ill. July 6, 2009) ("In this case, a 15-month-old child was physically removed from his home at the direction of DCFS and separated from his parents. Under these circumstances, no reasonable child would have felt free to leave."). Defendants cite no authority to the contrary. Therefore, the Court rejects Defendants' argument that Tate has not plausibly alleged that Cali was seized.

## C. Qualified Immunity

Defendants also argue that even if they did point their guns at Cali, they reasonably believed that they were permitted to do so as part of an initial security sweep, so they are entitled to qualified immunity. Defendants support their argument by citing courts from outside the Seventh Circuit that found that momentarily pointing guns at non-threatening individuals is permissible in the initial stages of securing a space. *See* R. 69 at 7-8 (citing cases). However, even if this Court were to find those cases persuasive, Defendants' qualified immunity argument fails on the

pleadings for much the same reason the Court rejected Defendants' argument that the video contradicted Plaintiffs' allegations. There are simply too many gaps in perspectives captured by the videos for the Court to find that the officers' actions were reasonable as a matter of law. "Too little is known about the circumstances in this case to determine if, by pointing their weapons at the plaintiffs, the officers violated the plaintiffs' clearly established rights." *Atkins v. Hasan*, 2015 WL 3862724, at *7 (N.D. Ill. June 22, 2015). "Even if, when first entering [the apartment] it was reasonable for the officers to point their weapons . . . it does not necessarily follow that any continued gun-pointing was appropriate." *Id.* Discovery is necessary to fill in the gaps in the videos, to determine both whether any individual officer pointed their gun at Cali, and if so, whether that action was sufficiently unreasonable to deny qualified immunity.

## II.    The Search

### A.    The Warrant (Counts II and IX)

Plaintiffs claim that the officers procured the warrant without probable cause. To survive a motion to dismiss such a claim, a plaintiff must allege that "reasonably well-trained officers in their positions should have known that the testimony or affidavits they provided in support of the warrants would have failed to establish probable cause, so that they should not have applied for the warrants in the first place." *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003). This means that the officers "knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and that the false statements

were necessary to the judicial officers' determinations that probable cause existed for the arrests." *Id.* A 'reckless disregard for the truth' is demonstrated by showing that the officers entertained serious doubts as to the truth of their statements, had obvious reasons to doubt the accuracy of the information reported, or failed to inform the judicial officer of facts they knew would negate probable cause." *Id.* at 743.

Here, Plaintiffs have plausibly alleged that the officers had reason to doubt the informant's statement. This is because Plaintiffs allege that the informant's information turned out to be *entirely wrong*. This was not a case of an incorrect address. Defendants searched the address and apartment the informant identified. But "Drako" was not selling drugs out of it. A completely erroneous statement permits the plausible inference that the officers should have known the statement was at least not entirely correct. It is possible that the informant was simply mistaken or lying, or that the officers had no reason to doubt the informant's statement. But the allegation that the informant was entirely wrong implies that there must have been some obvious hole in the informant's story that the officers should have noticed. Discovery is necessary to determine whether that is true.

Plaintiffs do not directly allege that the officers had a reason to believe the informant's statement was false, but that is not surprising. Plaintiffs are not privy to all of the officers' communications with the informant. Although the affidavit that was part of the warrant application is part of the pleadings here (because Plaintiffs reference it in their complaint, and Defendants attached it to their motion), the affidavit does not describe the officers' relationship with the informant. The affidavit

only provides what the officers told the judge the informant stated about the suspect and his location. It does not relate what the officers knew about the informant, and whether the information the officers knew about the informant should have caused them to question the informant's veracity. And conversely, it does not provide whether the informant had proven reliable in the past. Without this knowledge, Plaintiffs cannot directly allege that the officers should have known the informant's statement was insufficient to establish probable cause. Instead, Plaintiffs must rely on inference from the alleged *complete* falsity of the informant's statement.

Rather than directly alleging that the officers knew or should have known the informant's statement was false, Plaintiffs claim that the officers had an obligation to independently corroborate the informant's statement. As discussed, this is a plausible claim in light of the complete inaccuracy of the informant's statement. Defendants argue, however, that the Seventh Circuit has not required police to perform such independent corroboration to establish probable cause. This is true. When an informant risks implicating himself in criminal activity and appears before the judge issuing the warrant, the Seventh Circuit has affirmed warrants issued without independent corroboration but confirmed only by the police traveling with the informant to verify the target address. *See Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1057 (7th Cir. 2018); *United States v. Lloyd*, 71 F.3d 1256, 1259-60 (7th Cir. 1995). The same can be said of the facts in the affidavit in this case, so the warrant in this case was sufficient to establish probable cause.

13

But that is not the relevant question at this point in the proceedings. Rather, the question is whether Plaintiffs' allegations plausibly allege that the officers had reason to doubt the informant's statement. The answer to that question requires discovery into what the officers knew "at the time they applied for the warrant." *See Edwards*, 907 F.3d at 1061. And as discussed, the fact that the informant's statement was allegedly entirely inaccurate permits the plausible inference that the officers knew information about the informant that should have caused them to doubt the informant's veracity. And with reason to doubt the informant's veracity, the officers should have undertaken independent verification of the informant's statement, which is what Plaintiffs claim.

A corollary to the rule that probable cause must be assessed according to "what the officer knew at the time he sought the warrant" is that it is not relevant "how things turned out in hindsight." *See Beauchamp*, 320 F.3d at 743. Although Plaintiffs' claim is based on allegation of "how things turned out"—i.e., the informant was wrong—the Court's reasoning is not properly characterized as "hindsight." Hindsight would be second-guessing the probable cause finding based on the facts as the officers represented them at the time. That is not what is happening here. Rather, the totality of the allegations permits the plausible inference that the facts were *not* as the officers represented them at the time. Subsequent facts cannot be used to undermine a probable cause finding based on what was known at the time, but subsequent facts can be used to infer that the facts at the time were not what they seemed.

Lastly, Defendants argue that case law affirming probable cause findings based on informant statements with minimal corroboration establishes that the officers who procured the warrant are entitled to qualified immunity. But again, the relevant question here is not whether the affidavit established probable cause. It is whether the officers knew the affidavit was false or had additional information not reflected in the affidavit that would have undermined the probable cause determination. In either circumstance, it is clearly established that procuring a warrant in reckless disregard of that truth violates the Fourth Amendment. *See Beauchamp*, 320 F.3d at 742-43 (citing *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978)). Therefore, dismissal based on qualified immunity is not appropriate at this point in the proceedings, and Defendants motion to dismiss Counts II (procuring warrant without probable cause) and IX (trespass) is denied.[2]

### B.  Manner of Entry & Search

Plaintiffs also claim that Defendants' manner of entry and search violated the Fourth Amendment. The Fourth Amendment requires that officers act reasonably in seeking entry to a home, in detaining the people in the home once they enter, and in conducting the search. Plaintiffs claim that: (1) Defendants failed to wait enough time after knocking before entering; (2) Defendants unreasonably used handcuffs and guns in securing the scene; and (3) Defendants unreasonably damaged property during the search.

---

[2] Plaintiffs' trespass claim is based on their allegation of unlawful entry with a warrant issued without probable cause. Because that issue requires discovery, the same is true for the trespass claim.

### 1.    Knock and Announce (Count III)

"[O]fficers must wait a reasonable amount of time after announcing their intention to serve a search warrant before attempting a forcible entry." *United States v. Gillaum*, 372 F.3d 848, 854 (7th Cir. 2004). "Whether police officers paused long enough before admitting themselves into a home . . . entails a highly contextual analysis, requiring examination of all the circumstances of the case." *United States v. Leonard*, 2000 WL 266489, at *2 (7th Cir. Mar. 8, 2000); *see also Florek v. Village of Mundelein*, 649 F.3d 594, 603 n.2 (7th Cir. 2011) ("What is reasonable must be determined under the particular factual situation presented."). "[T]here is no bright-line rule delineating the boundary between a reasonable and unreasonable amount of time for officers to wait." *United States v. Espinoza*, 256 F.3d 718, 722 (7th Cir. 2001). But in the case of a search warrant related to drug activity, "the Supreme Court has suggested that the police need not hold off for more than 15 or 20 seconds." *United States v. Collins*, 510 F.3d 697, 699 (7th Cir. 2007) (citing *United States v. Banks*, 540 U.S. 31, 37-38 and n. 5 (2003)). However, "the officers nonetheless may simply 'go straight in' if the circumstances support a reasonable suspicion of exigency." *Banks*, 540 U.S. at 36.

Defendants contend that the videos show they waited six seconds after knocking on Plaintiffs' door before they broke in. Plaintiffs contend it was two seconds. The Court's count is somewhere in between. In any case, it was a much shorter amount of time than is generally found to be reasonable.

Defendants argue that exigent circumstances were present because Christopher and Cierra had spotted the police from the balcony of the apartment the police intended to search. But that argument is undermined by Plaintiffs' allegation that they offered to let the police into the building. If Plaintiffs were permitting police entry, there was no reason for forcible entry.[3]

Besides being spotted from the balcony, the pleadings reveal no other reason for Defendants to believe that exigent circumstances existed. Although discovery may reveal that Defendants had reason to execute the search in accordance with the belief that weapons would be present in the apartment, the informant's statement gave no such indication. Additionally, Plaintiffs argue that having failed to independently corroborate the informant's statements, Defendants should have executed the search in accordance with the possibility that the informant was wrong. Plaintiffs were at least entitled to a reasonable opportunity to: (1) "comply with the law and peaceably permit officers to enter the residence"; (2) "avoid[] the destruction of property occasioned by forcible entry"; and (3) "prepare themselves for entry by law enforcement officers by, for example, pulling on clothes or getting out of bed." *Espinoza*, 256 F.3d at 723 (citing *Richards*, 520 U.S. at 393 n. 5; and *Wilson*, 514 U.S. at 930-32).

---

[3] Defendants do not argue that their entry into the building's vestibule constituted an "announcement" such that the time it took them to walk up the stairs should be included in the time Plaintiffs were afforded in warning. This makes sense since Plaintiffs have no expectation of privacy in the entryway area. *See United States v. Espinoza*, 256 F.3d 718, 723 (7th Cir. 2001). And until the police knock on a specific door, Plaintiffs could not know whether their apartment was the target of the search and that they should be expected to open the door.

According to Plaintiffs' allegations and what is apparent from the video, Defendants deprived Plaintiffs of these opportunities. Defendants broke down the door as Tate was on her way to open it. Tate was still in her nightgown. Christopher was forced to the floor at gunpoint. Cierra allegedly had guns pointed at her while Cali was in her arms. Plaintiffs allege that these traumatic experiences could have been avoided had Defendants been more patient and acted with due regard for the possibility that they had the wrong apartment (which Plaintiffs allege is not an uncommon occurrence when the Chicago Police execute search warrants) or for the possibility that the occupants of the apartment would cooperate. Perhaps discovery will reveal facts that justify Defendants' conduct. But Plaintiffs have stated a claim that Defendants' manner of entry into the apartment was unreasonable and violated the Fourth Amendment, and there is nothing on the videos clearly showing otherwise.

Defendants argue that they are entitled to qualified immunity for the manner of their entry into the apartment. But as discussed, case law clearly establishes Plaintiffs right to more time to answer the door under the circumstances as pled and as depicted in the videos. A grant of qualified immunity on Plaintiffs' claim that Defendants manner of entry was unreasonable is not appropriate on the pleadings.

### 2. Use of Guns and Handcuffs (Counts IV, VI, VII, and VIII)

Plaintiffs also claim that Defendants use of guns and handcuffs was unreasonable. On the basis of this allegation, Plaintiffs make claims for: (1) unreasonable search and seizure in violation of the Fourth Amendment; (2) false arrest under state law; (3) assault under state law; and (4) intentional infliction of

emotional distress under state law. Plaintiffs must plausibly allege unreasonable use of guns or handcuffs to state these claims.

Defendants cite case law holding that it is reasonable to use guns to secure the premises to be searched and to handcuff the occupants during the search. *See* R. 69 at 13-14; R. 89 at 15-17. But as Plaintiffs point out, use of handcuffs and guns—like the time required to wait for entry—is analyzed for reasonableness under the circumstances. *See* R. 83 at 25-27. Plaintiffs have plausibly alleged that they posed no real threat to the officers and immediately indicated their willingness to comply with the search. Whether Defendants use of guns and handcuffs in these circumstances was reasonable is a fact intensive analysis not amenable to decision prior to discovery. Qualified immunity is not appropriate for the same reason. Thus, Defendants motions to dismiss Counts III (Fourth Amendment unreasonable search), IV (Fourth Amendment false arrest and imprisonment), VI (assault), VII (state law false arrest and imprisonment), and VIII (intentional infliction of emotional distress) are denied.

### 3. Property Destruction (Count V)

"[T]he Fourth and Fourteenth Amendments provide a remedy when a citizen's property is unreasonably damaged during a search." *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) ("Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression." (citing *United States v. Ramirez*, 523 U.S. 65, 71 (1998))). The Supreme Court has held that "it is generally

left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Dalia v. United States*, 441 U.S. 238, 257 (1979). Yet "the manner in which a warrant is executed is subject to later judicial review as to its reasonableness." *Id.* at 258.

As discussed, Plaintiffs have plausibly alleged that it was unreasonable for Defendants to break down the door. Plaintiffs also allege that the officers broke a flat screen television by knocking it to the floor and ruined clothing by throwing it on the floor and spilling liquids on it. It is well-settled that the mess and damage that can result from a search for narcotics is generally reasonable. *See Dalia,* 441 U.S. at 258 ("officers executing search warrants on occasion must damage property in order to perform their duty"); *see also Weeks v. City of Chicago*, 2014 WL 3865852, at *6 (N.D. Ill. Aug. 6, 2014) ("The fact that the contents of the room were left in a pile and some cereal spilled on the counter does not demonstrate that [the officers'] intrusion went beyond what was necessary."). And officers are entitled to open drawers and other containers and even cut open walls and cushions when searching for drugs. *See Washington v. Godinez*, 1996 WL 599055, at *2 (N.D. Ill. Oct. 17, 1996) (officer acted reasonably when he removed ceiling tiles, tore insulation out of the ceiling, and removed and destroyed frozen food from a freezer in search of drugs). But it is not clear that ruining the television and clothing was necessary to execute the search. Again, the reasonableness of those actions will have to be judged in light of facts learned in discovery. Therefore, Defendants motion to dismiss Count V is denied.

### III.    Cali's Damages

Defendants characterize Plaintiffs' claim that Cali suffered emotional damages as "blatant speculation regarding an eleven-week old infant's psychological and emotional state fails to meet the pleading requirements" for Rule 12(b)(6). *See* R. 69. at 15. Maybe it is true that an 11-week-old infant cannot suffer legally cognizable emotional damages. But Plaintiffs have alleged that she did. *See* R. 60 ¶¶ 109, 112, 118, 121-123. Whether or not these allegations are true is a factual question that requires discovery.

### Conclusion

Therefore, Defendants' motion to dismiss [69] is denied.[4] The parties should meet and confer regarding a discovery schedule in advance of the status hearing set for November 20, 2020.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated:  November 16, 2020

---

[4] Defendants make a number of arguments that certain individual defendants should be dismissed from certain Counts regarding the reasonableness of the search because they did not participate in all aspects of the search. All individual defendants, however, participated in the entry into the apartment and will remain in the case for that reason. Who did what during the search will be sorted out on summary judgment if necessary.